IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 1:15-cv-00379-LTB-MEH

MARIE KATHLEEN WEST

     Plaintiff,

v.

AETNA LIFE INSURANCE COMPANY

     Defendant.

---

## ORDER

---

     In this suit under the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), Marie Kathleen West challenges Aetna Life Insurance Company's ("Aetna") decision to terminate her long-term disability benefits. Ms. West asks this Court to find that Aetna's determination was arbitrary and capricious, to order Aetna to reinstate her benefits, and to award interest on back due amounts and attorneys' fees and costs. Aetna counters that this Court should affirm its decision denying benefits, or if this Court finds error, remand the case to the plan administrator for a renewed evaluation of Ms. West's claim. Aetna filed an Administrative Record ("AR") (ECF No. 38), and after briefing (ECF Nos. 57, 61, 65, 66), the parties filed a joint motion for a judgment on the administrative record (ECF No. 68).

     I GRANT the joint motion for judgment (ECF No. 68), and I will ENTER JUDGMENT in favor of Ms. West. Aetna's decision terminating benefits was

inconsistent with the Social Security Administration's ("SSA") decision awarding them and every opinion of Ms. West's treating physicians. As I describe below, its decision was arbitrary and capricious and was not based on substantial evidence. I AWARD Ms. West back-due benefits plus interest at the statutory rate, and I ORDER Aetna to reinstate her benefits. I also AWARD Ms. West reasonable attorneys' fees and costs under 29 U.S.C. § 1132(g).

Ms. West shall file a brief and accounting of the back-due benefits plus interest, attorney fees, and costs she seeks to recover from Aetna on or before **March 6, 2018.** Aetna shall file a response brief and any objections to Ms. West's accounting on or before **March 20, 2018**. Ms. West may file a reply brief on or before **March 30, 2018.**

## I.  FACTS

## A.    Aetna's Long-Term Disability Plan

On September 4, 2007, Ms. West began working as a contract administrator at Ciber, Inc. She was a participant in a long-term disability plan that Aetna administered and underwrote. The plan defines disability as:

> From the date that you first become disabled and until Monthly Benefits are payable for 24 months, you will be deemed to be disabled on any day if:
> - you are not able to perform the material duties of your own occupation solely because of: disease or injury; and
> - your work earnings are 80% or less of your adjusted predisability earnings.
>
> After the first 24 months that any Monthly Benefit is payable during a period of disability, you will be deemed to be disabled on any day if you are not able to work at any reasonable occupation solely because of:
> - disease; or
> - injury

AR 8 (emphases omitted). A "reasonable" occupation is "any gainful activity for which you are; or may reasonably become; fitted by: education; training; or experience; and which results in; or can be expected to result in; an income of more than 60% of your adjusted predisability earnings." AR 22 (emphasis omitted). The plan gives Aetna discretionary authority to "determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy." AR 62.

**B.    Ms. West's Accident and Aetna's Initial Approval of Benefits**

On October 22, 2007, Ms. West fell on a concrete stair and hit her head. AR 599. She may have lost consciousness and had some "seizure activity." AR 589; *see also* AR 525. The next day, she went to her primary care physician for treatment, and he indicated she had lost consciousness and had a lump on her head. AR 473. She also went to a chiropractor for care soon afterward. AR 462–64, 715–17. It turns out she had fractured her spine. AR 1707.

Despite the fracture, Ms. West continued to work for several months after the fall and had conservative treatments like steroid injections to address her pain. AR 599, 713. The conservative treatments failed, Ms. West's symptoms worsened, and on July 30, 2008, she underwent a two-level vertebrae fusion. AR 1418–19. Ms. West returned to work about two months after the surgery. AR 589–91. However, she suffered from "severe axial pain, neck pain and burning pain down both of her arms." AR 506, *see also, e.g.,* AR 525. An April 2008 MRI revealed disc herniation at the cervical 5–6 and 6–7 levels, mild degenerative disc disease, and moderate

central canal stenosis at the cervical 6–7 levels. AR 734. She was eventually told to stop working and went on short-term disability in fall 2008. AR 589.

In spring 2009, Ms. West filed a long-term disability claim with Aetna. AR 65. Soon afterward, Ms. West had a second surgery. AR 497–507. Dr. Evalina Burger performed the surgery in May 2009; however, she noted that she was "not confident that we will be able to relieve all of [Ms. West's] pain." AR 516. At the May 2009 surgery, the hardware from the first fusion was removed, one disc was grafted, two discs were re-plated, and a third was replaced. AR 506. A post-operative x-ray showed a "good position of her hardware with no apparent hardware failure." AR 1546. When Ms. West was discharged from the hospital after the surgery, she was directed to avoid "heavy lifting, bending, or twisting for the next 6 weeks." AR 498. A severe post-operative bone infection complicated her recovery and required six weeks of intravenous antibiotics. AR 484–88, 498, 505.

While Ms. West initially reported that her right-arm weakness and neck pain were "100 percent gone," AR 488, she also complained of headache, myalgia (muscle pain), shortness of breath, nausea, intermittent tinnitus, and mild dysuria (pain or discomfort when urinating), AR 489. Soon after the surgery, Ms. West reported continued neck and arm pain, which Dr. Burger suspected may be from prior nerve damage. AR 1533. She also continued to use narcotic pain medicine. *Id.* A post-operative CT scan of her cervical spine from May 2009 showed that the prosthesis at the cervical 4–5 level "extends approximately 2mm into the ventral canal, without significant spinal stenosis." AR 502. Nevertheless, Dr. Burger concluded in

August 2009 that overall, Ms. West was doing "remarkably well," with improved range of motion and only slight weakness on the right side. AR 1533. But she also opined both in April 2009 and October 2010 that Ms. West could not work. AR 1816–21. She opined in April 2009 that Ms. West's disability was permanent. AR 1817.

In July 2009, AETNA approved Ms. West's claim for disability, determining she was unable to work at her "own occupation" as a contract administrator at Ciber beginning several months earlier, on January 26, 2009. AR 738–39. AETNA paid benefits during the entire 24-month "own occupation" term of the plan. *Id.* The records from that two-year "own occupation" disability period reflect regular complaints of continued pain from Ms. West. The records also show that Ms. West used various pain medications to alleviate her symptoms. *E.g.*, AR 763. At times, she reported some relief from the medications. *Id.* At other times, she reported acute pain. AR 764–65. She managed to reduce, but not eliminate, her opioid use by late summer 2009. AR 766–67. She also reported withdrawal symptoms and acute pain during periods when her prescriptions ran out. *Id.*

Beginning in January 2011, Aetna awarded Ms. West benefits under the "any reasonable occupation" provision of the plan, meaning it determined she was unable to work at any reasonable occupation. AR 828. Like the records from the two-year period preceding it, the records from 2011 reflect Ms. West's continued struggles with pain management. They also reflect some side effects from long-term opioid use. For instance, in February 2011, Ms. West went to Rose Medical Center in

Denver, Colorado with severe abdominal pain, vomiting, nausea, and a headache. AR 1440. She also reported continued neck pain. *Id.* She went to Rose Medical Center again in April 2011 with similar problems. AR 1449. One physician who treated her suspected that Ms. West's gastrointestinal issues were tied to the "large amount of narcotics" Ms. West was taking. AR 1453. In May 2011, Ms. West's father took her to Rose Medical Center with decreased consciousness and slurred speech. AR 1459. The treating physician described Ms. West's "history of narcotic dependence," and suspected a combination of sleep deprivation, a migraine, and chronic narcotic use caused her altered state. AR 1461, 1465. An ultrasound was normal, AR 1495, as was a CT scan of her head, AR 1492. An MRI showed findings "consistent with migraines or other causes of minimal microvascular disease" and no evidence of acute ischemic injury (stroke). AR 1494.

In June 2011, Ms. West began seeing Dr. Jason Peragine for pain management. AR 876–78. She reported her symptoms were "moderate in severity (7/10)." AR 876. Dr. Peragine planned to slowly taper her use of pain medications and weighed also using trigger point injections for pain management. AR 878. She was able to decrease her opioid use somewhat, but she continued to have pain in her neck, shoulder, and right arm. AR 873. When she decreased it further, she experienced significant pain. AR 871. She tried injections, and they provided the best pain relief she had ever had, but they only lasted about a week. AR 867, 869. By November 2011, Ms. West reported that the effectiveness of the injections had

decreased. AR 865 (reporting that the injections only provided 15% short-term improvement in neck pain).

## C.     Aetna's Termination of Benefits and SSA's Disability Award

In February 2012, Aetna told Ms. West it needed to conduct an independent medical evaluation "for further disability evaluation." AR 907. The amount already paid out on Ms. West's claim appears to have triggered this next-level review. *See* AR 229 (reporting that "approval limit exceeded Benefit Level Authority Review created"). At Aetna's request, Ms. West completed an "activities questionnaire," where she explained she still suffered from chronic pain and vertigo, did very little in the way of activities, and could not return to work. AR 993–98. Dr. Peragine also concluded, after treating her for over a year, that Ms. West was "unable to work." AR 1040 (January 2013 opinion); AR 1832 (September 2012 opinion); AR 1827–29.

At Aetna's insistence, and with expert assistance it helped her obtain, Ms. West applied for Social Security Disability Income in March 2012. AR 903–04, 916. SSA ultimately found her totally disabled as of March 1, 2009. AR 1192–1201. Aetna reduced its payments to Ms. West by the amount of the SSA award. AR 10, 1957.

In February 2013, Aetna asked Dr. Stuart Rubin, a rehabilitation and physical medicine specialist, to independently review Ms. West's medical records and opine on her physical (but not mental) impairments. AR 1050. The report does not specify which records Dr. Rubin reviews. It indicates he reviewed "all the records listed above," but there is no list of records above. *Id.* Dr. Peragine's contact information is listed above, which suggests Dr. Rubin at least reviewed his records.

*Id.* Dr. Stuart also tried to consult with Dr. Peragine about Ms. West's impairments, but after a failed game of phone tag, the two never spoke. AR 1051. Dr. Rubin opined, "based on the information available for review," that "functional impairment is not supported from 11/1/2012 to 11/1/2013." AR 1056–57. He found "no indication the claimant is experiencing any adverse medication effects during the time period in question." AR 1056. With her medication regimen "stable," Dr. Stuart concluded that Ms. West could work full-time in a sedentary job. AR 1056. In April 2013, Aetna sent Dr. Stuart's report to Dr. Peragine and asked him to opine on it within 15 days, AR 1053–54, but Dr. Peragine never responded because Ms. West stopped seeing him several months earlier when she started seeing Dr. Andrew Hong a pain management specialist, AR 1063, 1922.

In May 2013, Aetna sent Ms. West a letter terminating her benefits. AR 1060. Aetna advised Ms. West that while it previously advised her to apply for Social Security Disability benefits based on "medical and vocational information which indicated [she] was totally disabled," new information—Dr. Stuart's report and Dr. Peragine's statement that he was no longer treating Ms. West—demonstrated she was no longer disabled under Aetna's disability plan. AR 1063. The letter notified Ms. West of her right to appeal and told her she could provide additional information in her appeal. *Id.*

## D.   Ms. West's Appeal

Ms. West submitted an appeal in October 2013. The appeal included the entire record from her Social Security Disability proceeding and other medical records. It included a "Concentration Residual Functional Capacity Questionnaire"

completed by Dr. Hong. He described some side effects from Ms. West's medications and concluded her memory, concentration, understanding, and social interaction skills were impaired. AR 1139–40. He concluded she was unable to perform any job over an 8-hour work day. AR 1142. Dr. Hong also opined that she had physical limitations that impaired her ability to work. AR 1901. Dr. Hong's records also included a note reporting that , after several months of adjusting her pain medications, the treatment was "working very well in controlling her pain." AR 1925. But even then, Ms. West still reported headaches and dizziness. *Id.*

New information in the appeal also included records from Dr. Adam Wolff, a board-certified physician in neurology and neurophysiology who treated Ms. West beginning in June 2012. He similarly opined that Ms. West's memory, concentration, understanding, and social interaction skills were impaired. He concluded she could not work a normal workweek or workday. AR 1144–46; *see also* AR 1910 (opining that Ms. West had moderate impairment in her ability to understand and remember detailed instructions, carry out detailed instructions, and make judgments on simple work-related decisions). Dr. Wolff also reported "marked" impairment in her ability to deal with the pressure of a work setting and to changes in a work setting. AR 1911. He also reported that she suffered from severe dizziness and pain, which were exacerbated by "duress." AR 1910–11. Dr. Wolff additionally opined that because of her migraine headaches, Ms. West could not work. AR 1149–53. He pointed to an MRI which showed lesions in her frontal lobe as objective evidence of the headaches. AR 1151, *see also* AR 1179, 1700 (MRI

results). Dr. Wolff treated Ms. West with Botox injections for chronic neck and migraine pain. AR 1158–60, 1797–98.

The appeal also included an opinion from an eye doctor, Dr. Ellen Petrilla, who found that Ms. West's oculomotor skills were poor. AR 1156. She also found a "jerk nystagmus" on eye muscle testing, which neurological trauma can induce. *Id.* Dr. Petrilla concluded that Ms. West may have to endure "discomfort and an inability to focus" for her entire life. *Id.*

Records from Dr. Stanley Kerstein, an internist who treated Ms. West, reflected increased headaches, vertigo, and eye movement dysfunction. AR 1512. Additional records from Dr. Burger's office from April 2012 indicated that Ms. Burger thought Ms. West has "obviously done well," and looked great after losing weight and getting some plastic surgery. AR 1710. However, that description was tempered with Ms. West's complaints of severe vertigo. *Id.* Dr. Burger did not think, based on her review of an MRI that showed lesions in Ms. West's frontal lobes, that the vertigo was related to the brain abnormalities. *Id.* She encouraged Ms. West to see an ear, nose and throat specialist for further evaluation. *Id.* The ear, nose, and throat specialist conducted a videonystagmography (tests designed to document a person's ability to follow visual objects with their eyes and to assess whether inner ear problems are causing a balance or dizziness problem). AR 1181. The testing was normal. *Id.*

The appeal also included additional records and an opinion from Dr. Jessica Lee, a clinical psychologist whom Ms. West began seeing in April 2012. Dr. Lee

opined that Ms. West was slightly to moderately impaired in her ability to understand, remember, and carry out instructions. AR 1776. She described her as "consistently forgetful" and believed Ms. West's depression affected her cognition. *Id.* Dr. Lee also opined that Ms. West could not have "consistent performance on tasks" due to "fluctuating cognitive functioning and mood." AR 1777. She opined that during an eight-hour workday, Ms. West would be off task more than 30% of the time. AR 1918.

The appeal also included records from February 2013, when Ms. West saw Dr. David Opperman at the Colorado Voice Clinic to treat her dizziness. AR 1176. He recommended she see a neurologist and scheduled an MRI and some other tests. AR 1178. An MRI of her head showed "punctate periventricular and deep white matter FLAIR [fluid-attenuated inversion recovery] hyperintensities." AR 1180. The physician interpreting the MRI believed the hyperintensities could be "sequela of chronic migraine headaches, areas of gliosis from prior brain insult, or sequela of chronic small vessel ischemic disease." *Id.*

In May 2013, Dr. Howard Kerstein, an endocrinologist, evaluated Ms. West and observed nystagmus (rapid and uncontrolled eye movements), which he suspected may be related to her vertigo. AR 1943. He concluded that Ms. West's opioid use and head trauma may have suppressed her pituitary function. *Id.* He suggested she start hormone replacement therapy. *Id.*

Ms. West also included various imaging studies in her appeal. A lumbar spine MRI in November 2013 showed "multilevel disc protrusions and annular

fissures." AR 2008. At the lumbar 4–5 level, there was a "moderate sized broad based midline dorsal disc protrusion," which "may be in contact with the lumber 5 nerve roots on both sides," but "without overly compressing the nerves." *Id.* A January 2014 x-ray showed lower "lumbar and lumbrosacral junction degenerative disc disease and degenerative facet disease" and low bone density. AR 2019–20.

In March 2014, Dr. Adam Wolff sent a letter to Aetna. He explained that he disagreed with Dr. Rubin's conclusions. He explained that Dr. Rubin had "excluded the pertinent facts surrounding Ms. West's accident." AR 2167. He asserted that the origin of Ms. West's injuries was critical to understanding her impairments and that Dr. Rubin's limited review of the medical records meant he "neither understood the nature, nor the extent of Ms. West's head and spine injuries." *Id.* Dr. Wolff pointed out that Dr. Rubin apparently did not even know that Ms. West's symptoms began after a fall, when she fractured her spine and hit her head. *Id.* Dr. Wolff also pointed to a six-inch subdural hematoma and a concussion diagnosis as medical evidence of Ms. West's traumatic brain injury. AR 2168. He also explained that her injury permanently affected the strength of her back, right arm, hand, and fingers. *Id.* Dr. Wolff also explained that the time frame Aeta asked about (November 1, 2012 through November 11, 2013) was to some extent irrelevant because "[m]any, if not all of Ms. West's impairments are severe and permanent." AR 2169.

The appeal also included a long-term disability evaluation. Two occupational therapists reviewed Ms. West's medical records and met with her. They conducted over 30 different tests, both objective and subjective, to assess Ms. West's abilities.

The evaluators concluded it was a "valid and reliable test performance using standardized examinations and instruments that have been shown by research to predict vocational potential." AR 2060. They concluded she was impaired in a variety of ways, including fine and gross motor coordination and adaptive behaviors. AR 2077–78. One of the therapists also conducted an employability assessment and determined that Ms. West was "not able to do any work at any age in the local or national economy." AR 2096.

Aetna provided the updated medical records from the appeal to two medical sources, Dr. Naresh Sharma, board certified in anesthesiology with expertise in pain management, and Dr. Kristen M. Fiano, board certified in psychology/clinical neuropsychology. Dr. Sharma concluded Ms. West was capable of full-time employment and had no functional limitations or restrictions from May 1, 2013 to May 31, 2014. AR 2203–09. Similarly, Dr. Fiano concluded that the record did not "provide evidence of neuropsychological impairments" or "support for ongoing sequelae of a TBI." AR 2185–89. Aetna provided Dr. Sharma's report to Dr. Wolff and to Dr. Peragine for their comments, even though Ms. West had not seen Dr. Peragine for well over a year. AR 2207. Neither responded, although Dr. Sharma did have a copy of Dr. Wolff's earlier letter critiquing Dr. Rubin's assessment. AR 2177, 2179. Aetna did not provide Dr. Sharma's report to Dr. Hong, Ms. West's current pain-management provider. *See* AR 2197.

In June 2014, Aetna affirmed its prior decision denying benefits. It explained that it gave SSA's decision awarding benefits little weight because Aetna's decision

was based on more recent records. AR 2214. However, it did not identify the more recent records it relied on. *Id.* Aetna explained, "we have determined that there was insufficient medical evidence to support Ms. West's inability to work at any reasonable occupation." *Id.* Aetna also concluded there was no objective evidence of Ms. West's self-reported symptoms. AR 2213–14.

## II.  LEGAL STANDARD

ERISA governs employee benefit plans, including disability benefit plans. 29 U.S.C. § 1001 *et seq.* "When an individual covered by the plan makes a claim for benefits, the administrator gathers evidence, including the evidentiary submissions of the claimant, and determines under the plan's terms whether or not to grant benefits. If the administrator denies the claim, the claimant may bring suit to recover the benefits due to him under the terms of his plan." *Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1308 (10th Cir. 2007) (quotation omitted). Federal courts have exclusive jurisdiction over these suits because ERISA preempts most relevant state laws. 29 U.S.C. § 1144(a).

When, as here, a benefit plan "confers upon the administrator discretionary authority to determine eligibility for benefits or to interpret plan terms" a court reviews the plan administrator's decision for abuse of discretion, which, in this context, is interchangeable with the arbitrary-and-capricious standard. *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231 (10th Cir. 2012) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111, (2008)). This deferential standard means a plan administrator generally enjoys considerable latitude:

> When reviewing under the arbitrary and capricious standard, the Administrator's decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within his knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded in *any* reasonable basis. The reviewing court need only assure itself that the administrator's decision falls somewhere on a continuum of reasonableness—even if on the low end.

*Nance v. Sun Life Assur. Co. of Can.*, 294 F.3d 1263, 1269 (10th Cir. 2002) (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999)) (alteration omitted).

However, where a plan administrator is "operating under a conflict of interest, that conflict may be weighed as a factor in determining whether the plan administrator's actions were arbitrary and capricious." *Foster*, 693 F.3d at 1232 (alteration and quotation omitted). The weight given to the plan administrator's conflict of interest is necessarily case–specific and is informed by the severity of the conflict and the clarity of the other factors contributing to the decision. *Glenn*, 554 U.S. at 117–19; *see Nelson v. Aetna Life Ins. Co.*, 568 Fed. App'x 615, 620–21 (10th Cir. 2014) (unpublished).

My review is limited to the administrative record. *See Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1201 (10th Cir. 2013). I consider only the specific grounds that the administrator actually relied on to deny benefits, not alternative justifications that the administrator could have, but did not, rely upon. *Spradley v. Owens–Ill. Hourly Employees Welfare Ben. Plan*, 686 F.3d 1135, 1141 (10th Cir. 2012).

# III. ANALYSIS

## A.     Conflict of Interest

As both the plan administrator and the underwriter, Aetna operates under a conflict of interest. *Pinto v. Blue Cross Blue Shield of Okla.*, 217 F.3d 1291, 1296 (10th Cir. 2000). A conflict warrants more weight "where circumstances suggest a higher likelihood that it affected the benefits decision" and less weight "where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Glenn*, 544 U.S. at 117.

Aetna flagged Ms. West's benefit award for review because of the amount it had already paid out to her. *See* AR 229 (claim note reporting that "approval limit exceeded Benefit Level Authority Review created"); AR 347 (claim note explaining that payments were suspended because the approval limit was exceeded and the case was assigned to a "next level approver"). After that review, her benefits were terminated. This suggests that Aetna's financial interests played a part in its decision-making process.

However, Aetna also took steps to mitigate the impact of its conflict by retaining independent medical experts to review Ms. West's file. This suggests that while Aetna's financial interests played a part in triggering the review, it played a smaller part in the ultimate decision to terminate her benefits. *See Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009) (giving conflict "limited weight" where insurer "took steps to reduce its inherent bias by hiring two independent physicians"). Nevertheless, I note that the records provided to one of the independent physicians were not Ms. West's complete records—an omission one

16

of Ms. West's treating physicians suggested undermines his conclusions and limits his report's evidentiary value. AR 2167–70.

Another factor relevant to Aetna's conflict is the tension between the Social Security Administration's award of benefits and Aetna's denial. In *Glenn*, the Supreme Court held that encouraging and assisting a claimant to apply for Social Security benefits, while denying benefits under a plan using a similar disability standard, warrants "giving more weight to the conflict," because the "seemingly inconsistent positions" are "both financially advantageous" to the administrator. 554 U.S. at 118. I describe in some detail below (in Section III(B)) why I agree with Ms. West that the tension between SSA's decision and Aetna's warrants giving additional weight to Aetna's conflict.

Consequently, several factors suggest Aetna's conflict should be accorded some weight: the review appeared to be triggered by the amount Aetna had paid on the claim, it did not provide all of Ms. West's records to one independent physician, and its decision is in conflict with SSA's (as I describe in more detail in the next section). But Aetna mitigated its conflict by having two additional independent physicians review Ms. West's records before making its decision to terminate benefits. I accordingly give some—but not substantial—weight to Aetna's conflict in determining whether its decision was arbitrary and capricious. *See Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 (10th Cir. 1996) (explaining that a reviewing court "must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict").

B.    **Social Security Determination**

As I described above, I conclude the tension between Aetna's decision and SSA's warrants giving more weight to Aetna's conflict. I pause here to describe why I find Aetna's attempt to reconcile the inconsistent decisions unpersuasive.

Aetna required Ms. West to apply for Social Security Disability Income or her long-term disability insurance benefits would be reduced. AR 879–80. Aetna also helped her secure expert assistance to help with the application process. *E.g.*, AR 903, 1063. She applied for Social Security benefits in March 2012, AR 916, and on August 22, 2013, the Social Security Administration found her totally disabled as of March 1, 2009, AR 1196–1201.

The standard for establishing disability under the Social Security regime is actually more demanding than under Aetna's plan. To receive Social Security Disability Income, a claimant must establish she cannot perform *all* other occupations available in the national economy. *See* 42 U.S.C. § 423(d)(2)(a). Aetna's standard is similar in that it requires a claimant to prove she cannot work at any reasonable occupation. However, Aetna further limits the meaning of "reasonable occupation" to one where the claimant would earn more than 60% of [her] adjusted predisability earnings." AR 22. This suggests that Aetna's decision cannot be reconciled with SSA's.

However, Aetna argues its decision was based on more recent medical records, meaning there is no inconsistency between its decision and SSA's. But SSA awarded benefits on August 22, 2013, and Aetna initially determined Ms. West no longer qualified for benefits several months earlier, on May 1, 2013. Notably, in that

initial decision, Aetna acknowledged the conflict in urging Ms. West to apply for

Social Security benefits but then denying her claim:

> In 2009 we approved your claim for LTD benefits and subsequently
> encouraged you to work with our Social Security vendor, The
> Advocator Group, to apply for Social Security Disability (SSD) benefits
> through the Social Security Administration (SSA.) We asked you to do
> this not only because your plan requires that you apply for other
> income benefits for which you may be eligible, but also because there
> are advantages to you if you are approved for SSD benefits. At that
> time we had medical and vocational information which indicated that
> you were totally disabled and it appeared that you would be eligible for
> SSD benefits either for a closed period or an indefinite period.
>
> However, since that time, we have updated your LTD claim record as
> stated above, to include the recent Medical Peer Review and a response
> from your treating physician that he is no longer treating you. We now
> have found that you are no longer eligible for LTD benefits under your
> policy, as you are no longer disabled based on the plan definition of
> Totally Disabled quoted above.

AR 1063.

In this initial decision terminating benefits, Aetna resolved the conflict with

SSA's determination by identifying two new records—Dr. Rubin's report and Dr.

Peragine's statement that she was no longer a patient—that Aetna believed

suggested Ms. West was not disabled and therefore not entitled to any benefits. *Id.*

Ms. West was, of course, still under care for management of her chronic pain,

but under Dr. Hong instead of Dr. Peragine. Ms. West provided these records in her

appeal to Aetna, meaning a lack of treatment cannot serve as a valid basis for

terminating her benefits. As for Dr. Rubin's report, not only does it fail to list which

records Dr. Rubin reviewed to come to his conclusions, it appears to rely solely on

Dr. Peragine's records. AR 1050. Dr. Wolff pointed out that this omission means Dr.

Rubin may not have known Ms. West also injured her head when she severely injured her cervical spine. AR 2167–70. I have little trouble concluding that Aetna's original decision terminating benefits was inconsistent with SSA's not because it was based on reliable new evidence, but because its decision was based on a factual error and a report that fails to account for a substantial swath of Ms. West's medical history.

But that is not the end of the story. Aetna had two more medical professionals review Ms. West's records after her appeal. And unlike Dr. Rubin, both of them identified the records they reviewed, which were comprehensive. Thus, I turn to whether the decision upholding the initial termination of benefits on appeal is also in tension with SSA's decision.

On appeal Aetna offered the same reason for the conflict with SSA's decision as it initially did—new medical records:

> We are in receipt of a the [sic] Notice of Decision Fully Favorable Letter, dated August 22, 2013, that indicates Ms. West has been granted disability income benefits from the Social Security Administration (SSA). Although this letter reported that, the SSA determined Ms. West met their criteria for eligibility of benefits, we also acknowledge that Ms. West received additional treatment and we have received updated medical records from her providers, which demonstrate functional capacity. For this reason, we have given the fact that she is receiving SSD benefits little weight in our determination of whether she is eligible for LTD benefits under the policy.

AR 2214. Aetna did not point to any new medical records that demonstrated functional capacity. *Id.* This omission makes my review difficult, if not impossible, because I must look only to the plan administrator's stated reasons to assess

20

whether the decision was arbitrary and capricious. *See Spradley*, 686 F.3d at 1140–41; *cf. Russ v. Colvin*, 67 F. Supp. 3d 1274, 1279 (D. Colo. 2014) ("The court is neither inclined nor, indeed, authorized, to search through the administrative record in an attempt to pinpoint evidence that might support the ALJ's findings, and the Commissioner's attempts, post hoc, to fill in the blanks on the ALJ's behalf are improper as well." (citations omitted)). Indeed, the generic reference to "updated medical records" without any specific references probably at least warrants reversal.

Nevertheless, I scoured the voluminous record for new records that changed the evidentiary picture since SSA's decision and found none. Indeed, one of the new records Aetna points to in an attempt to defend the plan administrator's decision on appeal is an MRI that showed "deep white FLAIR hyperintensities," which the reviewing physician believed could be "sequela of chronic migraine headaches [or] areas of gliosis from prior brain insult." AR 1180; *see* Response Br. at 21, ECF No. 61. This supports, rather than undermines, Ms. West's claim because it is objective evidence of her brain injury and impairment. Another record—which includes a note from Dr. Burger that Ms. West looks great and had plastic surgery—was before the SSA. AR 1709–10; *see* Response Br. at 21, ECF No. 61. Moreover, Aetna fails to note that the same note indicates that Ms. West was suffering from vertigo. AR 1710. While Dr. Burger did not believe the vertigo was related to the fusion surgery, her conclusion hardly suggests that Ms. West had no impairment from the vertigo. *See id.* After all, Dr. Burger opined that Ms. West was permanently disabled. AR

1817. Another note, this one from Dr. Hong, that suggests Ms. West's pain was well-controlled on her then-current medication regime, was also before the SSA. AR 1925.

For these reasons, I give more weight to conflict between the SSA's decision and Aetna's than I would if the plan administrator had provided a legitimate explanation for the contradictory decisions. I emphasize, however, that I do not give undue weight to this conflict—I only give it some weight as I examine Aetna's denial of benefits.

## C. Evidentiary Analysis

Ms. West argues that Aetna did not properly consider or weigh the relevant evidence, and its denial of benefits was therefore arbitrary and capricious because it was not based on substantial evidence. Specifically, she argues Aetna ignored evidence pointing to disability, including the opinions of her treating physicians, and ignored its own conclusion that she was disabled for the preceding four years. Ms. West also argues that Aetna failed to provide a full statement of the basis for its decision. Because I agree with Ms. West that Aetna's decision was arbitrary and capricious based on its failure to account for substantial evidence of disability, I do not reach the latter two arguments.

A lack of substantial evidence to support findings may make a denial arbitrary and capricious. *Fought v. Unum Life Ins. Co. of Am.*, 379 F.3d 997, 1002–03 (10th Cir. 2004), *abrogated in part on other grounds by Glenn*, 554 U.S. 105; *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) ("Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of

law, bad faith, and conflict of interest by the fiduciary."). Substantial evidence is evidence which a reasonable mind might accept as adequate to support the conclusion reached—it is more than a scintilla but less than a preponderance. *Rekstad v. U.S. Bancorp.*, 451 F.3d 1114, 1119–20 (10th Cir. 2006). In determining whether the evidence in support of the administrator's decision is substantial, a court must "'take[] into account whatever in the record fairly detracts from its weight.'" *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994) (quoting *Nieto v. Heckler*, 750 F.2d 59, 61 (10th Cir. 1984)). Notably, "[s]ubstantiality of the evidence is based upon the record as whole." *Rekstad*, 451 F.3d at 1120.

Courts may not impose requirements on plan administrators to give particular evidence certain weight. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). A plan administrator is not required, for example, to give special weight to the opinions of a claimant's treating physician. *Id.* at 833. However, plan administrators cannot ignore claimant's relevant evidence, including readily available information that is not refuted by other evidence in the record. *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004) ("[F]iduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory."); *Caldwell*, 287 F.3d at 1284. For example, while a plan administrator need not give special weight to a claimant's doctors, it may be unreasonable for the administrator to credit the opinion of its own doctor who reviewed records over

opinions by treating physicians without sufficient explanation. *Rasenack ex rel.*
*Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1325–26 (10th Cir. 2009); *Mason v.*
*Reliance Standard Life Ins. Co.*, No. 14-cv-01415-MSK-NYW, 2015 WL 5719648, at
*7 (D. Colo. Sept. 30, 2015).

I conclude that Aetna's decision here is unsupported by substantial evidence
for several reasons. First, I conclude the plan administrator erred by relying on Dr.
Sharma's report without addressing the conflicting opinions and substantial
evidence to the contrary. Second, I conclude the plan administrator failed to
adequately address the objective evidence of brain injury when it terminated
benefits. Third, I conclude the plan administrator overlooked the evidence of
impairment reflected in the functional capacity assessment.

Because the evidence in the record clearly demonstrates that Ms. West is
entitled to benefits, I order Aetna to pay Ms. West back-due benefits plus interest at
the statutory rate and to reinstate her benefits.

### 1.  Dr. Sharma's Report

Although the plan administrator does not discuss Dr. Sharma's report in any
detail, her conclusions track it almost verbatim. For example, Dr. Sharma opined
that despite her complaints, Ms. West had "adequate cognition, emotional control,
focus and concentration" to work. AR 2180. The plan administrator likewise
concluded Ms. West had "adequate cognition, emotional control, focus and
concentration" to work. AR 2214. Dr. Sharma concluded that despite Ms. West's
reports of headaches, "she has made a satisfactory recovery from surgical
interventions requiring neck spine surgery." AR 2208. The plan administrator

likewise concluded "she has made a satisfactory recovery from surgical interventions requiring neck spine surgery." AR 2213.  Dr. Sharma concluded that Ms. West's 2013 brain MRI had "not shown any significant ongoing persistent pathology" and the abnormality it did show "has no relation to the injury she suffered." AR 2209. By contrast, Dr. Wolf concluded Ms. West's MR showed "lesions in the [right] frontal lobe," AR 1151, and the doctor who read the MRI concluded she had frontal lobe lesions consistent with brain injury and migraines, AR 1180. The plan administrator adopted Dr. Sharma's interpretation and concluded that Ms. West's MRIs had "not shown any significant ongoing persistent pathology" and the abnormality it did show "has no relation to the injury she suffered."  AR 2213. I could go on, but suffice it to say that the plan administrator's decision denying benefits relies heavily on Dr. Sharma's report. *See generally* AR 2210–15.

While there is of course nothing inherently wrong with relying on an independent medical expert's opinion, the plan administrator here adopted Dr. Sharma's findings only by improperly ignoring a large body of evidence that pointed strongly to disability. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."). For instance, Dr. Wolff, who unlike Dr. Sharma had treated Ms. West for years, opined she was disabled. He explained that "[m]any, if not all of Ms. West's impairments are severe and permanent." AR 2169. While Dr. Sharma—who has no particular expertise in neurology—dismissed Ms. West's EEG results as essentially normal, Dr. Wolff—

who is board certified in neurology and neurophysiology—cited them as objective evidence of her traumatic brain injury. AR 1151. In a comprehensive four-page, single-spaced letter, Dr. Wolff cited dozens of medical records and objective test results to support his conclusions. AR 2167–70. He also added that given his medical expertise, training, and treatment of Ms. West, he believed he was particularly qualified—and more qualified than a pain management expert—to opine on Ms. West's capabilities. AR 2167. But the plan administrator glossed over Dr. Wolff's opinion and the evidence supporting it. She described Dr. Wolff's 2013 opinion that Ms. West could only sit for two hours, stand for one, and walk for one without interruption. AR 2212. She described Dr. Wolff's extensive 2014 letter about Ms. West's "severe and permanent" impairments in two sentences, conceding that he "strongly" believes Ms. West was impaired. Aside from this rote (and brief) summary of Dr. Wolff's opinions, the plan administrator largely ignored them. Rather than explaining why she rejected his opinion, she improperly recited Dr. Sharma's opinion as if it was indisputable fact. In my analysis here, I must consider evidence that fairly detracts from the reliability of Dr. Sharma's report. The fact that he has no expertise in neurology and that his opinions on Ms. West's brain injury differed from a board-certified neurologist's detracts from Dr. Sharma's report.

Similarly, the plan administrator improperly ignored the opinions of all of Ms. West's other providers, none of whom agreed with Dr. Sharma's conclusions. *Rasenack*, 585 F.3d at 1326 (reversing denial of benefits where the plan

administrator "cherry-picked the information helpful to its decision to deny [the claimant's] claim and disregarded the contrary opinions of the medical professionals who examined, treated, and interviewed [the claimant]"). To be sure, Aetna now offers various post-hoc explanations for rejecting this evidence, but my review is focused on the plan administrator's actual, not conceivable, reasons for denying benefits. *See Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1191 (10th Cir. 2007) ("[W]e will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation." (quotation omitted), *abrogated on other grounds by Glenn*, 554 U.S. 105. I would hardly be deferring to the plan administrator's decision if I conjured up reasons she never contemplated and affirmed on that basis.

The plan administrator similarly discounted the evidence that Ms. West suffered from side effects from her medications. Dr. Sharma opined that although Ms. West was dependent on opioids for pain management, there was no evidence suggesting her "functional ability is directly impacted or affected by medication effects or adverse drug reactions." AR 2180. The plan administrator adopted this opinion, concluding she had no "significant side effects" from her opioid dependence. AR 2214. But the record is replete with evidence of negative side effects, including indigestion, nausea, insomnia, exhaustion, dizziness, slow digestion, and hormonal problems. *E.g.*, AR 1139–40, 1453, 1925, 2170. Dr. Wolff concluded that when Ms. West's pain medications were "increased to a level where the pain is tolerated, the

side effects from these medications create other debilitating health problems that also preclude her from functioning day to day." AR 2170. Dr. Hong's records similarly note that even when Ms. West's pain was well-controlled, she complained of dizziness. AR 1925. While Ms. West told Dr. Hong her pain was well-controlled, she did not say it was gone. In fact, she told him that she could not work in part because of her ongoing neck pain and vertigo. AR 1929 (record from August 12, 2013).

I also find it puzzling that despite Aetna's manful insistence in its pleadings that the relevant records are the more recent ones, Dr. Sharma asked Dr. Peragine, a pain management provider who had not seen Ms. West in well over a year, for a peer-to-peer consultation. AR 2197. Nowhere does the plan administrator or Dr. Sharma explain why Dr. Hong, Ms. West's then-current pain management provider, was not contacted instead. Given Dr. Sharma's recognition of the importance of a peer-to-peer consultation, it only follows that the peer-to-peer consultation should be with the right provider. I am at a loss why Dr. Peragine would be a better choice than Dr. Hong, particularly since the question was not whether Ms. West was ever disabled—it was whether she was *still* disabled. Dr. Sharma's failure to consult with Ms. West's current pain management provider further undermines the reliability of his report.

While a plan administrator need not discuss all the evidence, her decision must be "sufficiently supported by facts." *Nance*, 294 F.3d at 1269 (quoting *Kimber*, 196 F.3d at 1098). By ignoring and discounting large swaths of medical evidence

and opinions, the plan administrator's decision fails even that forgiving standard. I recognize a plan administrator need not "pore over the record," picking out and addressing all evidence supporting payment or denial of a claim. *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 806–07 (10th Cir. 2004). But where, as here, a plan administrator shuts her eyes to readily available evidence that suggests the claimant is entitled to benefits, her decision is arbitrary and capricious. *Id.*

The opinion of Dr. Fiano, a psychologist who reviewed Ms. West's files, does not save the plan administrator's decision. Dr. Fiano concluded there was no evidence of *neuropsychological* impairment in the record. AR 2188. At the same time, she acknowledged evidence of problems with memory and concentration. *Id.* Dr. Fiano offers many possible alternative explanations for Ms. West's memory and concentration problems, including medication side effects and the impact of severe pain. AR 2188. These explanations potentially support a finding of disability—just not one based on neuropsychological impairment. Thus, Dr. Fiano's opinion, which is largely inconclusive as to the etiology of her impairments, does not support the plan administrator's conclusion that Ms. West can return to her previous job. And even if it did, the plan administrator did not rely on it in her decision terminating benefits, which means it cannot serve as a basis for affirmance. *Cardoza*, 708 F.3d at 1201.

### 2. Long Term Disability Evaluation

The plan administrator's decision barely touches the results of an entire day of testing by occupational therapists. This is the only functional capacity evaluation in the record, and there is nothing in the record to undermine it. The occupational

therapists who conducted the testing concluded it was reliable. The testing included a battery of neuropsychological behavioral measures regarded as "one of the most extensively validated vocational evaluation systems in the field." AR 2097. It also included over 30 different physical tests, for example, measuring Ms. West's physiological reactions as she lifted items. AR 2078. These measures include validity factors that cannot be manipulated. *Id.* The testing revealed very strong correlation between objective and subjective measures. *Id.* For instance, Ms. West's heart rate increased points during a lift test—a reflection of the substantial effort it took her to lift. *Id.*

No evidence in the record refutes the results of these tests. The results suggest that Ms. West's subjective complaints are not exaggerated and that her injury causes disabling impairments. In fact, assessments like this one are designed to accurately and *objectively* measure how much an individual's degree of pain or fatigue limits her functional capabilities, one of the critical issues in assessing Ms. West's disability. *Holmstrom v. Metlife*, 615 F.3d 758, 770 (7th Cir. 2010). In these circumstances, Aetna's plan administrator was obligated to "explain why it found the FCE unreliable." *Id.* at 771.

### 3. Objective Evidence of Brain Injury

One final problem with the plan administrator's decision is that it ignores the objective evidence of Ms. West's traumatic brain injury. Dr. Sharma had no expertise in this area, but the plan administrator favored his interpretation of Ms. West's brain MRI over a board-certified neurologist's. As a result, the plan administrator denied Ms. West's claim and concluded that her brain MRI did not

show abnormalities related to her injury, AR 2213, despite the contrary of conclusions of Dr. Wolff as well as another physician who interpreted the MRI. The plan administrator erred by ignoring this contrary evidence in her decision.

### 4. Effect of Aetna's Conflict

Based on the overwhelming and unaddressed evidence of disability in the record, I would likely conclude the plan administrator's decision was arbitrary and capricious even without evidence of a conflict. But the evidence of a conflict here underscores the problem with Aetna's decision. Based on essentially the same evidence that was before SSA when it found her completely disabled, Aetna concluded Ms. West was not disabled. While SSA did not have the opinions of Aetna's independent medical experts before it, the medical records before it were largely the same. Yet with no meaningful explanation—and with ample evidence of disability, evident in SSA's award and the medical records themselves—Aetna adopted Dr. Sharma's opinion over those of Ms. West's treating physicians. As Dr. Wolff explained, "[e]very one of Ms. West's . . . treating physicians, the Social Security Administration, and O.T. Resources have *all* concluded Ms. West is unable to perform any sedentary level position." AR 2167–70. The plan administrator's unexplained and largely wholesale adoption of Dr. Sharma's conclusions, despite ample evidence to the contrary, suggests that its financial conflict of interest skewed its decision-making. *See Pinto*, 217 F.3d 1291 (noting that insurance company "has a financial interest in denying claims in order to remain economically viable as well as competitive within the insurance industry").

In sum, the plan administrator's decision was not based on substantial evidence, particularly in light of the record as a whole. She largely ignored the conclusions of Ms. West's treating physicians in favor of Dr. Sharma's opinion, despite his relative lack of expertise. Because I conclude that "the evidence in the record clearly shows that the claimant is entitled to benefits, an order awarding such benefits is appropriate." *See Flinders*, 491 F.3d at 1194.

## IV. FEES

Both parties request an award of attorney's fees. The provisions of 29 U.S.C. § 1132(g) permits a court, in its discretion, to award a reasonable attorney fee to either party in an ERISA action such as this case. When deciding whether to award attorney's fees, a court should consider: "(1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of fees; (3) whether an award of fees would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions." *Cardoza*, 708 F.3d at 1207. "No single factor is dispositive and a court need not consider every factor in every case." *Id.* Based on a consideration of these factors, I award Ms. West reasonable attorneys' fees and costs. Aetna's conflict, its ability to pay, and its flawed decision denying benefits all militate in favor of the award.

## V. CONCLUSION

The parties' joint motion for judgment is GRANTED (ECF No. 68). Because Aetna's decision denying benefits was arbitrary and capricious, I will ENTER

JUDGMENT in favor of Ms. West. It is further ORDERED that Aetna shall pay Ms. West back-due benefits plus interest at the statutory rate and shall reinstate her benefits. I also AWARD Ms. West reasonable attorneys' fees and costs.

Ms. West shall file a brief and accounting of the back-due benefits plus interest, attorney fees, and costs she seeks to recover from Aetna on or before **March 6, 2018.** Aetna shall file a response brief and any objections to Ms. West's accounting on or before **March 20, 2018**. Ms. West may file a reply brief on or before **March 30, 2018.**

Once total amount of the back-due benefits plus interest, attorney fees, and costs is fixed by the Court, the clerk shall enter final judgment.

Dated: February ___14___, 2018 in Denver, Colorado.

BY THE COURT:

s/ Lewis T. Babcock
LEWIS T. BABCOCK